Filed 6/4/26

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| C.F., a Minor, etc., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>ALTERNATIVE FAMILY<br>SERVICES, INC.,<br><br>    Defendant and Appellant. | A170226, A171966<br><br>(Sonoma County<br>Super. Ct. No. SCV-264540) |

A foster family agency (FFA) is a nonprofit organization that, among other things, screens, approves, supports, and supervises homes for foster children. (See Health & Saf. Code, § 1502, subd. (a)(4).) Plaintiffs and respondents C.F., E.F., and S.F. (plaintiffs) were sexually abused in a foster home approved and supervised by defendant and appellant Alternative Family Services, Inc. (defendant), an FFA. Plaintiffs sued defendant, as well as the foster parents, and a jury found defendant negligent. The jury awarded plaintiffs $24.7 million in damages, assigning 60 percent of the responsibility to defendant, 35 percent to the foster father who perpetrated the abuse, and 5 percent to the foster mother.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V and VI of the Discussion.

While both sides concede defendant owed plaintiffs a duty of care, they sharply disagree on the scope of that duty. Plaintiffs argue the trial court properly instructed the jury that defendant had a duty to protect them, without any limitations on that duty based on a consideration of the factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*). Defendant contends that, under *Rowland,* the general duty of care should be restricted, such that it had no duty to protect plaintiffs from sexual abuse absent actual knowledge that the foster father presented a risk of such abuse. We disagree with both positions. As we discuss below, the defendant's position restricts its duty of care too much and provides inadequate protection to foster children, one of the state's most vulnerable populations. Plaintiffs' position on the duty of care, which the trial court adopted, is too broad. It fails to recognize the important role FFAs play in our foster care system and to appropriately account for the connection between a defendant's conduct and the injury suffered and moral blame for the harm. A proper balancing of the *Rowland* factors imposes liability on an FFA where it *knew or should have known* of a risk of abuse by a particular foster parent.

The trial court's instructions were in error because they permitted the jury to find defendant liable absent a showing it knew or should have known of the risk presented by the foster father. However, because defendant has not shown a reasonable probability the jury would have reached a different verdict had it been properly instructed, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant is an FFA founded in 1978 that helps place children into foster homes. Defendant approves foster homes for placement and counties make the actual placements.

2

Plaintiffs entered the foster care system in April 2018, after their father left them in a car for 11 hours while he was at a casino. At the time of foster care placement, plaintiffs were six years old (C.F.), five years old (S.F.), and two years old (E.F.). After a screening process, defendant approved the home of Mark and Marta Martinez as a foster care placement on April 15. Plaintiffs were placed in the Martinez home on April 16.

Plaintiffs were removed from the Martinezes' home on June 25, 2018, after behavior by one of the children during a visit with plaintiffs' biological father created a suspicion of sexual abuse. Plaintiffs were interviewed at the Redwood Children's Center, and C.F. and E.F. described sexual abuse by Mr. Martinez. He subsequently confessed to sexually abusing C.F. on multiple occasions and was arrested. He ultimately pled guilty to two counts of sexual abuse, one against C.F. and one against E.F. The social worker who interviewed S.F. concluded that he had witnessed the sexual abuse of his siblings. One of plaintiffs' experts testified that it was more likely than not that S.F. was abused as well.

In May 2019, plaintiffs sued the Martinezes, defendant, and Does 1 through 30. At the time of trial, there were two remaining causes of action against defendant—negligence and negligent breach of mandatory duties. The jury trial began in September 2023.

Plaintiffs' Evidence

Plaintiffs presented evidence that defendant was negligent in approving the Martinezes and in supervising the home during plaintiffs' placement.

Craig Barton, designated by defendant as the person most qualified to address the safety and supervision of foster children, acknowledged that

3

defendant was obligated to keep foster children safe from sexual abuse by foster parents.  He acknowledged that such abuse is a "known danger."

Dr. Elizabeth Jeglic and Dr. Sylvia Pizzini testified as experts for plaintiffs.  Dr. Jeglic explained that "children in foster care are particularly vulnerable to childhood sexual abuse" and "are sexually abused at higher rates."  Thus, "it is vital that [youth-serving organizations] have strict policies and procedures in place to prevent victimization."  Dr. Pizzini testified that child safety "is the cornerstone of the child welfare services, in general, and certainly for placements in a certified foster home."  Adding to the risk is the circumstance that pedophiles will seek out opportunities to gain access to children.

Plaintiffs presented evidence to show defendant violated four California Department of Social Services (CDSS) regulations in approving the Martinezes' home.  Dr. Pizzini explained that the CDSS "through its Community Care Licensing division issues regulations that are required by statute," governing "how [FFAs] are reviewed and assessed."  Defendant was required to comply with each of the regulations before approving a foster home.

First, plaintiffs presented evidence to show defendant violated CDSS's FFA Interim Licensing Standards (Licensing Standards) section 88331.5(a),[1] which requires separate individual interviews with each prospective foster

---

[1] The then-current version of the Licensing Standards was effective March 23, 2018.  The current version of the Licensing Standards, effective February 1, 2023, is available at <http://www.cdss.ca.gov/Portals/9/CCL/Childrens-Residential-Licensing/ILS/FFA_ILSv6.pdf> (as of June 4, 2026).  The past versions are available at <https://www.cdss.ca.gov/inforesources/childrens-residential/resources-for-providers/laws-and-regulations> (as of June 4, 2026).

parent. Ms. Martinez said in a deposition that she was never interviewed alone and she was not aware of Mr. Martinez being interviewed alone. Defendant's report listed four interviews with "Marta and Mark." Dr. Pizzini opined the regulation was violated.

Second, plaintiffs presented evidence to show defendant violated former Licensing Standards section 88331.5(c), which provided, "The majority of interviews shall take place in the home of an applicant."[2] Defendant's report stated that there were two interviews totaling six hours at defendant's office and two totaling three hours at the Martinez home. Dr. Pizzini opined the regulation was violated.

Third, plaintiffs presented evidence to show defendant violated former Licensing Standards section 88331.5(d), which required FFAs to complete "psychosocial assessment[s]" of prospective foster parents. The required "risk assessment . . . shall include": "(A) Past and current alcohol and other substance use and abuse history. [¶] (B) Physical, emotional, sexual abuse and family domestic violence history. [¶] (C) Past and current physical and mental health." (Former Licensing Standards, § 88331.5(d)(3).)[3] On a questionnaire completed by Mr. Martinez during the screening process, he

---

[2] Although defendant does not raise the issue on appeal, that was actually *not* the effective language in April 2018. Effective March 2018, version 3 of the Licensing Standards was adopted, providing, as does the current version, that "*[o]ne* of the required interviews shall take place in the home of an applicant . . . ." (Licensing Standards, § 88331.5(a)(1)(C), italics added; see fn. 1, *ante*.)

[3] Although there are no material differences, these were not the Licensing Standards in effect when the Martinezes were approved in April 2018. (See fn. 1, *ante*.) In the version then in effect and the current version, the reference to "a psychosocial assessment" is in a definitions section and the risk assessment requirements are in Licensing Standards section 88331.5(b)(4). (See fn. 1, *ante*.)

left nine of 26 questions unanswered.[4]  The unanswered inquiries included questions regarding whether he suffered childhood sexual and physical abuse; who of his family members had been sexually or physically abused; whether he or anyone in his family had been suspected of sexual or physical abuse; whether he or anyone in his family had viewed child pornography; whether he or anyone in his family had been suspected of child neglect; whether he or anyone in his family had been arrested or convicted of a criminal offense; and whether he or anyone in his family had a history of mental illness or suicidal behavior.  Mr. Martinez had answered "no" to separate questions as to whether he had been sexually or physically abused and "no" to a question whether he possessed or viewed sexually explicit content.  In a deposition, Ms. Martinez stated her husband was never questioned regarding the blanks on the questionnaire in the screening interviews.  Dr. Pizzini opined the regulation was violated; she stated that the failures to answer were "red flag[s]" and it was "critical" for the home approver to discuss the nonanswers and document the discussions.

Fourth, plaintiffs presented evidence to show defendant violated Licensing Standards section 88431.1, which provides that a prospective foster parent "shall be in good physical and mental health."  Ms. Martinez stated at a deposition that defendant did not ask any questions about mental health during the screening process.  She said her husband had a lot of personality changes after sustaining a shoulder injury at work in 2015; he was more stressed, had trouble concentrating and understanding some things, and sometimes behaved erratically.  She stated that, if she had been asked, she

---

[4] The questionnaire was part of a tool called the Structured Analysis Family Evaluation (SAFE) adopted by defendant to vet foster parent applicants.  Following the SAFE home study is considered the best practice in approving foster parents.

6

would have told defendant that she had seen changes in her husband's mental health after his injury and that he needed therapy. During the criminal proceedings, Mr. Martinez was diagnosed with a delusional disorder. Dr. Pizzini opined that the CDSS regulation was violated. She also opined that a person with delusional disorder is not a safe foster parent.

Plaintiffs also presented evidence to show defendant was negligent in approving the Martinezes because it failed to comply with its own policies. For example, plaintiffs' experts testified that it was a violation of defendant's safety policies to fail to provide a resource family manual to the Martinezes. Defendant also failed to interview all five of the Martinezes' adult children and to contact and/or document the Martinezes' references, as required by their policies.

Plaintiffs' experts also criticized defendant's failure to follow up on Mr. Martinez's answer on a questionnaire that "sexual relations" were a "major area[] of conflict" with his wife. Dr. Pizzini explained that "[i]t's important . . . to question the applicants about . . . what's going on in the sexual relationships, and how does it affect their communication with each other, their relationship, and, more importantly, how does it spill out into their other relationships? Are there potentials for taking sexual frustrations and carrying them out with other people, . . . especially children in this case." Dr. Jeglic explained that if a parent is "not getting their sexual needs met, they may try to meet them with a child within the home." In a deposition, defendant's expert agreed that was a "risk factor" that the home approver should have followed up on.

Finally, plaintiffs presented evidence to show defendant was negligent in supervising the Martinezes. First, defendant failed to remove the children after Ms. Martinez expressed concern that they could not speak Spanish.

7

The Martinezes had requested Spanish-speaking children and only one or two. Dr. Pizzini opined that it was a violation of the standard of care not to respect the Martinezes' linguistic and numerical preferences and that, after Ms. Martinez expressed her concerns, defendant should have removed plaintiffs. Second, defendant conducted no unannounced visits in the 70 days plaintiffs were in the Martinezes' home, and defendant's caseworker met with the children in private only twice for a total of 17 minutes. Third, defendant failed to follow up on observations of plaintiffs sitting on Mr. Martinez's lap, which Ms. Martinez stated occurred in front of a caseworker.

Defendant's Evidence

In 2017 and 2018, the typical process for approval of a foster family began when a prospective foster parent contacted defendant's office. After an initial screening, the application was forwarded to an "approver." The approver would conduct a further preliminary screening and, if suitable, the parents would be invited to participate in trainings. The approver would visit the family's home and conduct further screenings, and, once the home was ready for placement, the approver would make a final inspection.

Mark and Marta Martinez were referred to defendant by another FFA in 2017. Married since 1991, they raised five children, three of whom were from Ms. Martinez's prior marriage. There were no indications of child sexual abuse involving any of the five children. The Martinezes also served as foster parents with another FFA for about six years, during which they fostered around 10 children total. There is no indication any of those children were abused.

The Martinezes passed FBI, Department of Justice, and Child Abuse Central Index background checks and there is no indication they had any arrests, criminal convictions, or involvement with Child Protective Services.

8

Defendant's approver, Lisa Van Zantwyk, did not observe any symptoms of delusional disorder during the nine hours of interviews or 16 hours of training with the Martinezes. Ms. Martinez told defendant that her husband's injury did not affect his functioning and indicated on her questionnaire that her husband did not have any mental health issues. One of the Martinezes' daughters testified that she did not observe any changes in her father's behavior after 2015 and that she was unaware of any mental illness her father may have experienced after 2015.

Ms. Van Zantwyk testified that, although she did not recall the specifics of her interviews, she would have asked Mr. Martinez about his questionnaire response that sexual relations were an area of conflict with his wife. She explained that she would *not* have referenced the discussion in her report if the issue "was talked out and determined between us that there is not an issue."

As to the questions Mr. Martinez did not answer on the questionnaire, Ms. Van Zantwyk testified it was not uncommon for applicants to leave questions unanswered and it was her practice to obtain answers to the questions during the interviews. She only documented that follow up in her report if there was a problem. The report states that Mr. Martinez "reported that he did not have any childhood or adolescent history of physical, sexual or emotional abuse." The report also states he "reported no psychiatric history" and nothing in his adult history "indicate[s] that he has ever been suspected of, charged with or investigated for child abuse, neglect or failure to protect a child." Although her written report does not mention it, Ms. Van Zantwyk testified it was her "standard practice" to meet with couples "together, and then separately." The reason for separate interviews is because a prospective foster parent "will share more openly if it's them alone in the room. They'll

9

disclose typically more information about what has happened from birth till now." It was her consistent practice for 15 years to conduct such separate interviews and she had no reason to believe she did not do so in this case. It was not her practice to "separate[] out the time for the separate interviews" in her reports.

As part of the screening process, defendant obtained a reference for the Martinezes from a social worker from their previous agency who worked with the Martinezes between 2008 and 2013, facilitating approximately nine foster placements. The social worker told defendant "the family was wonderful with the foster children in placement and [had] no allegations during their time with them and she highly recommends them to continue as foster parents."

Defendant obtained another positive reference from one of the Martinezes' adult daughters. On the form, she answered that she was "[v]ery comfortable" allowing her parents to "care for [her] child permanently if [she] were unable to do so." She testified she grew up with foster siblings and never witnessed any sexual abuse or other concerning behavior by her father. The Martinezes had five grandchildren and two great-grandchildren, and she was unaware of any allegations of sexual abuse involving them. Defendant also received references from another daughter and two friends.

During plaintiffs' placement, defendant's caseworker, Yuliana Hernandez, visited the home to "make sure [the plaintiffs] were safe and that their needs were being met." She visited weekly for 90 minutes. During her visits, Ms. Hernandez interacted with both the Martinezes and plaintiffs, to make sure the plaintiffs were safe and comfortable. She also spoke with plaintiffs privately. She observed no red flags during the visits and no specific signs of child abuse. She never saw the plaintiffs sit on Mr.

10

Martinez's lap.  An unannounced visit was not required within the 70-day placement.

Four Sonoma County social workers who met with plaintiffs while they were placed with the Martinezes observed no indications of abuse.

Defendant's Motions and the Verdict

After plaintiffs' case-in-chief, defendant moved for nonsuit, arguing there could be no liability because there was no evidence defendant had actual knowledge of Mr. Martinez's propensity for sexual abuse.  The trial court denied the motion.

Following the conclusion of evidence, both parties moved for a directed verdict.  Defendant argued, again, that liability required evidence of actual knowledge of Mr. Martinez's propensity to commit abuse.  As to defendant, plaintiffs argued, among other things, that the regulatory violations showed both negligence per se and negligence because the violations were contrary to the standard of care.  The trial court denied both motions, except it granted plaintiffs C.F. and E.F. a directed verdict as to Mr. Martinez.

 In December 2023, the jury found defendant negligent and awarded plaintiffs a total of $24.7 million in damages.  The jury apportioned fault as follows: 35 percent to Mark Martinez, 5 percent to Marta Martinez, and 60 percent to defendant.

The trial court entered judgment in January 2024.  The court denied defendant's motion for new trial and for judgment notwithstanding the verdict and defendant appealed (No. A170226).  In October 2024, the trial court entered an amended judgment including over $4.6 million in costs.  Defendant appealed (No. A171966) and this court consolidated the appeals.[5]

_____

[5] This court received amicus curiae briefs in support of defendant from American Property Casualty Insurance Association, California Alliance of

## DISCUSSION

I.    *The State's Interest in Protecting Foster Children From Sexual Abuse*

It is well established that "[o]ne of society's highest priorities is to protect children from sexual or physical abuse." (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1078–1079; see also *Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1137 (*Youth Soccer*) ["our society recognizes that the protection of children from sexual abuse is a paramount goal"].)

"The goal of the foster care system is to provide for the health, safety, and well-being of children and adolescents while fostering reunification or an alternative permanency arrangement (adoption, guardianship, placement with relatives, or independent living) when reunification is not possible." (Szilagyi, M.D., Ph.D., et al., *Health Care Issues for Children and Adolescents in Foster Care and Kinship Care* (Oct. 2015) vol. 136, No. 4, Pediatrics e1131–e1140 (Szilagyi).)[6]  Most children in foster care have a history of child abuse, neglect, or exposure to domestic violence. (Szilagyi, *supra*.)  They are separated from their communities and other family members who can serve as natural protectors, increasing their vulnerability.  Once in foster care, children are exposed to a higher risk of sexual abuse.  (Trivedi, *The Harm of Child Removal* (2019) 43 N.Y.U. Rev. L. & Soc. Change 523, 542–543;

_____

Child and Family Services, Nonprofits Insurance Alliance of California (NIAC), and David and Margaret Home, Inc.; and in support of plaintiffs from Children's Advocacy Institute, Panish Shea Ravipudi LLP, and Consumer Attorneys of California.

[6] Szilagyi, *supra*, is available at <https://publications.aap.org/pediatrics/article/136/4/e1131/73819/Health-Care-Issues-for-Children-and-Adolescents-in?autologincheck=redirected> (as of June 4, 2026).

12

Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse and Neglect* (1988) 23 Harv. C.R.-C.L. L.Rev. 199, 205.)

Accordingly, the state's interest in protecting foster children from sexual abuse in foster homes cannot be overstated.

II.     *The Role of FFAs and the Insurance Availability Dilemma*

"FFAs are nonprofit entities that contract with county placing departments to find placements for children who require more intensive care than a typical foster family home, usually as an alternative to a group home or short-term residential therapeutic program.  FFAs recruit, certify, and train foster parents and provide social workers and other support to these foster families."  (Cal. Dept. of Insurance, Ins. Comr. Ricardo Lara, Notice (Aug. 23, 2024) p. 1 (2024 Commissioner Lara Notice);[7] see also Health & Saf. Code, § 1502, subd. (a)(4) [defining FFAs].)[8]  There are more than 200 FFAs in California.  (2024 Commissioner Lara Notice, p. 1.)  Over 6,700 children were supported by FFAs in foster family homes in the 2024–2025 fiscal year.[9]

---

[7] The 2024 Commissioner Lara Notice is available at <https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Notice-Foster-Family-Liability-Insurance-Availability-August-2024.pdf> (as of June 4, 2026).  Defendant's January 3, 2025 request for judicial notice of the 2024 Commissioner Lara Notice is granted.  (Evid. Code, § 452, subds. (c) & (h).)  The request for judicial notice is otherwise denied as unnecessary to resolution of the present appeal.

[8] Some counties perform the FFA functions rather than contracting with private FFAs.  (See Health & Saf. Code, § 1502, subd. (a)(4).)  The parties do not address whether liability issues differ when counties perform the functions of an FFA, and that question is beyond the scope of this decision.

[9] (Cal. Dept. of Social Services, Local Assistance Estimates for the 2026–27 Governor's Budget, Caseload Projections (2026) pp. 33–34

13

According to the Legislature, "It is the public policy of the State of California that foster family agencies or noncustodial adoption agencies, also known as FFAs, provide necessary services to vulnerable youth throughout the state and are integral to the foster care system." (Code Civ. Proc., § 1062.31.) In particular, FFAs serve the state's policy in favor of home-based placements over institutional placements, as reflected in the 2015 Continuum of Care Reform Act. (See Stats. 2015, ch. 773, § 1(a); see also *In re A.M.* (2020) 53 Cal.App.5th 824, 834.) The act's preamble recites that "research demonstrates that being cared for in a family improves outcomes for children who have experienced abuse and neglect." (Stats. 2015, ch. 773, § 1(c)(4).)

In recognition of the state's interest in protecting foster children, FFAs are required to be licensed (Cal. Code Regs., tit. 22, § 88005) and are subject to numerous regulations governing approval and supervision of foster families. (See, e.g., Welf. & Inst. Code, § 16519.5; Health & Saf. Code, §§ 1502, subd. (a)(4), 1506, 1530; Cal. Code Regs., tit. 22, § 88000 et seq.) These regulations include screening requirements expressly intended to protect foster children from sexual abuse. (See, e.g., Welf. & Inst. Code, § 16519.5, subd. (d)(2)(A)(i)(III); Cal. Code Regs., tit. 22, § 88019.2; Licensing Standards, § 88331.5(b)(4)(B); see fn. 1, *ante*.) An FFA that violates regulations may be subject to penalties, including license revocation. (Health & Saf. Code, § 1550.)

---

<https://www.cdss.ca.gov/Portals/9/Additional-Resources/Fiscal-and-Financial-Information/LOcal-Assistance-Estimates/2026-27/2026-27-caseload-packet.pdf> [as of June 4, 2026].) We take judicial notice of the FFA caseload data in the document at the weblink. (Evid. Code, § 452, subds. (c) & (h).)

14

In 2024, Insurance Commissioner Ricardo Lara concluded that "many of the state's more than 200 nonprofit [FFAs] are on the verge of losing their risk pooling liability coverage, without which they cannot legally operate." (2024 Commissioner Lara Notice, p. 1; see fn. 7, *ante*.) He explained, "Over the past few decades, due to an increase in claims, changing risk appetites, and other market conditions, most insurers left or are leaving the insurance market that previously provided commercial liability insurance coverage for these nonprofit FFAs. As a result, this has left a single nonprofit pooled risk arrangement – the Nonprofits Insurance Alliance of California (NIAC) – with providing this required coverage for approximately 90% of the FFAs operating in California." (2024 Commissioner Lara Notice, p. 1.) He continued, "Primarily due to recent high-valued court judgment settlements against FFAs, . . . the NIAC began issuing nonrenewal notices to some FFAs last month as well as pausing acceptance of coverage for new FFAs. . . . This lack of coverage will likely force many FFAs to start shuttering their programs, thus upending the stability of the foster children and youth that they serve. On a larger scale, thousands of foster children and youth are potentially at risk of losing their current FFA placement." (*Id.* at p. 2.)[10] Commissioner Lara's notice concluded with an exhortation for "all property and casualty insurance companies licensed or doing business in California to initiate or expand their offerings for this coverage to FFAs so that these

_____

[10] In its amicus curiae brief, NIAC explains, "Insurers are leaving the market because the risk involved with insuring FFAs is untenable." The brief continues, "NIAC cannot insure FFAs in the current environment because it cannot reasonably calculate the value of future claims" and "NIAC was forced to cease insuring FFAs in California at the insistence of its reinsurers."

important agencies can continue to serve thousands of children and youth in the state's foster care system." (2024 Commissioner Lara Notice, p. 2.)

A subsequent notice from Commissioner Lara dated October 22, 2025, stated that "[t]o date, no insurers have submitted a rate filing to my Department that would initiate or expand their offerings for coverage to FFAs." (Cal. Dept. of Insurance, Ins. Comr. Ricardo Lara, Notice (Oct. 22, 2025) p. 1 (2025 Commissioner Lara Notice).)[11]

III.    *Negligence Law and the* Rowland *Factors*

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' " (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*).) "Whether a duty exists is a question of law to be resolved by the court," while breach and causation are questions for the factfinder. (*Ibid.*; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 769, 772–774 (*Cabral*).)

Although each person has a duty to act with reasonable care (Civ. Code, § 1714), " 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' [Citation.] 'A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*).) "A duty to control, warn,

---

[11] The 2025 Commissioner Lara Notice is available at <https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Notice-Foster-Family-Liability-Insurance-Availability-October-2025-FINAL.pdf> (as of June 4, 2026). Defendant's November 10, 2025 request for judicial notice of the 2025 Commissioner Lara Notice is granted. (Evid. Code, § 452, subds. (c) & (h).)

16

or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] . . . the foreseeable victim of that conduct.' [Citations.] Specifically, a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct." (*Ibid.*) "Similarly, a duty to warn or protect may be found if the defendant has a special relationship with the potential victim that gives the victim a right to expect protection." (*Ibid.*; see also *id.* at p. 627 ["there is generally no duty to protect others from the conduct of third parties. The 'special relationship' doctrine is an exception to this general rule"]; *Brown, supra,* 11 Cal.5th at p. 215 ["In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm"].)

"A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' [Citation.] Relationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests, are all examples of special relationships that give rise to an affirmative duty to protect. [Citations.] The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Brown, supra,* 11 Cal.5th at p. 216.)

FFAs undoubtedly have a special relationship with the foster children they serve. As explained previously (part I, *ante*), foster children are a

17

uniquely vulnerable population. FFAs have an extraordinary impact on the fate of foster children, given that they screen, recommend, and monitor foster parents, and foster children have little ability to protect themselves if placed in an unsuitable home. (See *Regents*, *supra*, 4 Cal.5th at p. 620 [special relationship generally has an "aspect of dependency in which one party relies to some degree on the other for protection"]; see also *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 670–673 (*Archbishop*) [surveying special relationship cases].) Accordingly, the court in *Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 683 (*Doe v. Los Angeles*), which involved an FFA defendant, stated "there is no real dispute that Children's Institute" (an FFA) "had a special relationship with Doe" (a foster child). (See also *D.G. v. Orange County Social Services Agency* (2025) 108 Cal.App.5th 465, 471 (*D.G.*).)[12]

Even where there is a special relationship, courts may create an exception "from the general rule of duty . . . if other policy considerations clearly require" it. (*Regents*, *supra*, 4 Cal.5th at p. 628.) In *Rowland*, *supra*, 69 Cal.2d 108, the California Supreme Court "identified several factors that may, on balance, justify excusing or limiting a defendant's duty of care. These include: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame

---

[12] Arguably there is also a special relationship between an FFA and a foster parent it screens, approves, and supervises. (See, e.g., *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435–439 (*Tarasoff*) [special relationship between a therapist and his patient created duty to exercise reasonable care to protect third persons from patient's violence].) However, we need not determine whether we also may find a duty based on that relationship, because it is clear there is a special relationship between an FFA and the foster children it serves.

attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citation.] These factors must be 'evaluated at a relatively broad level of factual generality.' [Citation.] In considering them, we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.' [Citation.] In other words, the duty analysis is categorical, not case specific." (*Regents*, at pp. 628–629.) "By making exceptions . . . only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make." (*Cabral*, *supra*, 51 Cal.4th at p. 772; accord, *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1144 (*Kesner*).)

"The *Rowland* factors fall into two categories. The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability. The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Regents*, *supra*, 4 Cal.5th at p. 629.) *Rowland* and its progeny "recognize that even when two parties may be in a special relationship, the unforeseeability of the kind of harm suffered by the plaintiff or other policy factors may counsel against establishing an

affirmative duty for one party to protect the other." (*Brown*, *supra*, 11 Cal.5th at p. 219.)

IV.    *Application of the* Rowland *Factors*

The present category of cases consists of negligence claims against FFAs based on sexual abuse of foster children due to allegedly negligent screening and supervision of foster parents.  Defendant argues the duty to protect should be limited: liability should attach only where an FFA had actual knowledge of the risk of harm.  Plaintiffs argue no limitation on the duty to protect is justified.  We adopt a different position: FFAs have a duty to protect foster children from sexual abuse where an FFA *knew or should have known* a foster parent presented a risk of such harm.[13]  As explained below, although the sexual abuse of foster children is generally foreseeable, other *Rowland* factors—the closeness of the connection between the negligence and the harm, moral blame, and the limited availability of insurance—weigh against liability absent at least constructive knowledge of a specific risk of harm, and the prevention of sexual abuse does not require imposition of liability based on general foreseeability alone.

A.    *Foreseeability Factors*

1.    *Foreseeability of Harm*

" 'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.' [Citations.]  In examining

---

[13] Defendant frames the knowledge question as "notice of the molester's assaultive propensities."  That is too narrow.  It is possible that other types of information will indicate that the foster parent presents a risk of sexual abuse.  For example, information that a foster parent was sexually molested as a youth might be information indicative of a risk, even though such information is not about propensity *per se*.

foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." ' " (*Regents*, *supra*, 4 Cal.5th at p. 629.)  "For purposes of duty analysis, ' "foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." . . . [I]t is settled that what is required to be foreseeable is the general character of the event or harm . . . not its precise nature or manner of occurrence.' "  (*Kesner*, *supra*, 1 Cal.5th at p. 1145.)

At the outset, we observe that, in addressing foreseeability, defendant focuses exclusively on the underlying facts, claiming that they show its lack of actual knowledge that "Martinez had any propensity to sexually harm a child."  Defendant argues that Martinez "had raised his own biological children," "[h]is daughters vouched for him," "[h]e had previously successfully served as a foster parent," and there was no evidence he had previously committed sexual abuse.  Defendant then suggests that the question for this court is "whether it is reasonably foreseeable that a foster parent who has previously served as a foster parent, who has had criminal checks, who has no criminal record, who has raised biological and foster children without incident, and for whom *there is no evidence of any prior molestation or proclivity* would molest a foster child."  However, that articulation of the issue is simply an abstracted version of defendant's favored facts below, with no reference to the alleged negligent conduct.  Instead, the proper question is whether it is reasonably foreseeable that an FFA's negligence in screening

21

and/or supervising a foster parent could result in the sexual abuse of a foster child.  (See *Regents*, *supra*, 4 Cal.5th at p. 629; see also *D.G.*, *supra*, 108 Cal.App.5th at p. 472 ["We must examine whether it was foreseeable that the *category* of negligent conduct was likely to result in the type of harm alleged"].)

Another important threshold observation is that courts have actually used three different formulations to describe what harms are considered "foreseeable," depending on the general contexts and the relationships between the defendants, plaintiffs, and perpetrators.  In particular, a "foreseeable" harm can be defined as: (1) a risk of harm that a defendant knew or should have known about (a "constructive knowledge" standard); (2) a risk of harm that a defendant had actual knowledge about (an "actual knowledge" standard); or (3) a risk of harm that is a generally known risk of the type of negligence under consideration (a "general foreseeability" standard).  In other words, as explained below, some courts have treated harms as foreseeable where defendants have actual *or* constructive knowledge of a specific risk posed by a specific third party, other courts only where defendants have actual knowledge of such a specific risk, and other courts when a known risk of harm exists even if a defendant could not reasonably have discovered the risk posed by a specific third party.

Because foreseeability is a limitation on whether " ' "liability may appropriately be imposed" ' " (*Regents*, *supra*, 4 Cal.5th at p. 629), the three formulations of foreseeability are also effectively limits on the duty to protect. (*Brown*, *supra*, 11 Cal.5th at p. 222 [pursuant to the *Rowland* analysis, "a court might conclude that duty should not be imposed because, for example, the type of harm the plaintiff suffered was unforeseeable"].)  Additionally, even where a type of harm is a foreseeable result of a type of negligence, the

22

remaining *Rowland* factors may justify a further limitation on the duty to protect, including requiring a greater showing of a defendant's knowledge of the risk to support imposition of liability.[14]  Thus, although we initially discuss the three formulations of foreseeability in the context of the first factor in the *Rowland* analysis, we will return to the different formulations in balancing all the factors (part IV.C, *post*) to determine the most appropriate limitation on the duty to protect.

In the present category of cases, involving alleged FFA negligence in screening and supervising foster parents, defendant argues that the sexual abuse of foster children is unforeseeable absent actual knowledge that a specific foster parent presented a risk of abuse, and defendant further argues this court should require such a showing of actual knowledge as a limitation to the duty to protect after consideration of all the *Rowland* factors.  On the other hand, plaintiffs argue that the sexual abuse of foster children is a generally foreseeable risk and that the totality of the *Rowland* factors justify no limitation on the duty to protect.  As explained below, we conclude that sexual abuse is a generally foreseeable harm of an FFA's negligence in screening and/or supervising a foster parent.  *However*, balancing all the

---

[14] We observe that foreseeability limits are built into the articulation of some long-established specific negligence torts.  For example, " 'California case law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee. [Citation.]  Liability is based upon the facts that the employer *knew or should have known* that hiring the employee created a particular risk or hazard and that particular harm materializes.' " (*McKenna v. Beesley* (2021) 67 Cal.App.5th 552, 566, italics added; see also *id.* at pp. 566–567 [constructive knowledge also required for negligent entrustment]; *Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1208 [same for premises liability claim].)  Those foreseeability limits reflect *Rowland*-type policy judgments about the scope of the duty to protect in those specific categories of cases.

*Rowland* factors leads us to conclude that adoption of a constructive knowledge limit on the duty to protect is appropriate.

### a. *The Constructive Knowledge Standard in the Supreme Court*

Constructive knowledge "means knowledge 'that one using reasonable care or diligence should have, and therefore is attributed by law to a given person.' " (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1190; accord, *Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 228.) "In general, '[p]roof of actual knowledge focuses on what information a defendant must have been aware of, while proof of constructive knowledge rests on a defendant's duty to discover information.' " (*Lee*, at p. 228.)

The Supreme Court employed the constructive knowledge formulation of foreseeability in the *Rowland* context in *Regents*, *supra*, 4 Cal.5th 607. There, a student at the University of California at Los Angeles experienced auditory hallucinations and believed other students were criticizing him; school administrators learned of the delusions and attempted to provide mental health treatment; and the student eventually stabbed a fellow student during a chemistry lab. (*Id.* at p. 613.) The court held that universities have a special relationship with their students during curricular activities. (*Id.* at p. 627.) The court then considered whether, under *Rowland*, policy considerations "justif[ied] excusing or limiting" that duty to protect. (*Id.* at p. 628.) The court concluded that a "reasonable university could foresee that its negligent failure to control a potentially violent student . . . could result in harm to" other students. (*Id.* at p. 629.) It is a "case-specific question" for the jury to determine whether a university "was, or should have been, on notice that a *particular* student posed a foreseeable risk of violence." (*Id.* at p. 630.) Thus, in that context, at least constructive

24

knowledge is necessary for the harm to be deemed foreseeable. After concluding that the other *Rowland* factors did not justify a broader exception from liability, *Regents* exempted universities from their duty to protect where they lacked such knowledge. (*Id.* at p. 634 ["we hold that colleges have a duty to use reasonable care to protect their students from *foreseeable* violence during curricular activities" (italics added)].)[15]

The California Supreme Court also equated foreseeability with actual *or* constructive knowledge in *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861 (*William S. Hart*). There, the court considered a school district's liability for allegedly negligently hiring, retaining, and supervising a guidance counselor who sexually harassed and abused a student. (*Id.* at pp. 865, 877.) The court concluded that the school district had a special relationship with the student, which "entailed the duty to take reasonable measures to protect plaintiff from injuries at the hands of others in the school environment." (*Id.* at p. 877.) The court then concluded that the *Rowland* factors justified "[a]dditional limits" on the "scope of the duty." (*Ibid.*) As relevant here, the court observed that, "[u]nless the individual alleged to be negligent in a hiring or retention decision *knew or should have known* of the dangerous propensities of the employee who injured the plaintiff, there is

---

[15] Under the Supreme Court's jurisprudence, foreseeability may be included in the characterization of the duty to protect (*Regents*, *supra*, 4 Cal.5th at p. 627) or viewed as a limit on the general duty to protect following application of the *Rowland* factors (*Brown*, *supra*, 11 Cal.5th at p. 211). Under either perspective, the *Rowland* analysis will exempt unforeseeable harms from liability. (See, e.g., *Regents*, at p. 629 [the foreseeability factor determines whether " ' "liability may appropriately be imposed" ' "].) Accordingly, while we follow *Brown's* approach, our result would be the same if we were to reason that the special relationship creates a duty for FFAs to protect foster children from foreseeable harm, with foreseeability defined through the *Rowland* analysis.

little or no moral blame attached to the person's action or inaction." (*Id.* at p. 878, italics added.)  The court held that "the duty of care owed by school personnel includes the duty to use reasonable measures to protect students from foreseeable injury at the hands of third parties acting negligently or intentionally" (*id.* at p. 870), with foreseeability defined, as in *Regents*, as whether the school district "knew, or should have known, of the counselor's propensities" (*id.* at p. 865; see also *id.* at pp. 869–870).[16]  (See also *Roe v. Hesperia Unified School Dist.* (2022) 85 Cal.App.5th 13, 26 (*Hesperia*) ["The negligence standard articulated by" *William S. Hart* "imposes liability on a school district on the basis of supervisory personnel's constructive knowledge that an employee is prone to harm students"]; *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 169, 174 (*Novartis*) [in *Rowland* analysis, applying a constructive knowledge standard in the context of drug warning labels].)[17]

---

[16] As noted previously, the negligent hiring cause of action includes constructive knowledge as an element (see fn. 14, *ante*), but, as relevant here, *William S. Hart* embraced that formulation of foreseeability as a limitation in its *Rowland* analysis.

[17] Other decisions, both by the Supreme Court and by Courts of Appeal, have employed a constructive knowledge formulation of foreseeability as to various risks presented by third parties, albeit outside discussion of the *Rowland* factors.  (See, e.g., *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 936 [student's "tendency to drive recklessly"]; *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 919 (*Murrieta*) [risk posed by police officer who abused minors during ride-alongs], disapproved on another ground in *Brown*, *supra*, 11 Cal.5th 204; *Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1214 [risk of harm presented by employee]; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 395 (*Juarez*) [negligent "selection, supervision and retention" claim based on scoutmaster's sexual misconduct], disapproved on another ground in *Brown*, *supra*, 11 Cal.5th 204.)  And, in *Tarasoff*, *supra*, 17 Cal.3d at page 439, without citing *Rowland*,

26

Ignoring the Supreme Court's constructive knowledge formulation of foreseeability in *Regents*, *William S. Hart*, and *Novartis*, defendant argues that this court should follow the approach of the Court of Appeal in *Doe v. Los Angeles*, *supra*, 37 Cal.App.5th 675, which adopted the actual knowledge standard in a suit against an FFA.  In that case, a foster child was sexually abused by her foster mother's two sons.  (*Id.* at p. 679.)  The FFA in that case "certified" the foster mother, placed the plaintiff in her home, and assigned a social worker to monitor the home.  (*Id.* at p. 680.)  While there, the teenage plaintiff entered into a sexual relationship with one of the sons, who allegedly lived in the garage at the start of the placement, and was raped by the other son while the mother was out of town.  (*Id.* at p. 679.)  The plaintiff alleged the FFA failed to conduct statutorily mandated visits and "to properly screen [the foster mother] and her sons."  (*Id.* at p. 680.)  The Court of Appeal agreed the FFA had a special relationship with the plaintiff but quoted a prior Court of Appeal decision for the proposition that, in order to be liable for the conduct of a third party, " '[i]n addition to the special relationship . . . , there must also be evidence showing facts from which the trier of fact could reasonably infer that the [defendant] had prior *actual knowledge*, and thus *must have known*, of the offender's assaultive propensities.' "  (*Id.* at p. 682, quoting *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1084 (*Romero*).)  Because there was no such evidence in the case, the trial court properly granted nonsuit.  (*Doe v. Los Angeles*, at pp. 679, 681–686.)

---

the Supreme Court tied a therapist's duty to protect to constructive knowledge of the risk of harm posed by a patient.

If read to support an actual knowledge requirement in *all* third party liability situations, the language quoted from *Romero*, *supra*, 89 Cal.App.4th 1068 is not a correct statement of the law. As the Supreme Court made clear in *Brown*, *supra*, 11 Cal.5th 204, the existence of a special relationship *alone* is sufficient to impose a duty of care. (*Id.* at p. 216 ["The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly."].) Whether that duty of care should be *limited* is a separate question addressed under the *Rowland* factors. (*Id.* at p. 218 [*Rowland's* "multifactor test" is "a guide for determining whether to recognize an 'exception' to the general duty of care"]; see also *Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1128 [if courts find a special relationship, they go on to "balance[] the policy factors set forth in *Rowland* [citation] to assist in their determination of the existence and scope of a defendant's duty in a particular case"]; accord, *Brown*, at p. 212.) Actual knowledge is a limit on a duty of care that may be imposed under a *Rowland* analysis (see *A.L. v. Harbor Developmental Disabilities Foundation* (2024) 102 Cal.App.5th 477, 494–496 (*A.L.*)), but courts may not categorically impose an "actual knowledge" limit on the duty of care owed to persons injured by third parties in special relationship cases without undertaking that analysis. (See *Doe v. Lawndale Elementary School Dist.* (2021) 72 Cal.App.5th 113, 128–129 (*Lawndale*) [declining to follow *Doe v. Los Angeles* for the same reason].) The decision in *Doe v. Los Angeles*, *supra*, 37 Cal.App.5th 675 does not cite *Rowland*, or discuss its factors other than by asserting that the abuse in the case was unforeseeable in light of the facts the FFA defendant actually knew. (*Id.* at pp. 682–683.) The decision's failure to analyze the *Rowland* factors and explain its adoption of the actual knowledge standard as a matter of policy

28

means the decision is not authority on how to apply the *Rowland* factors to FFA liability for sexual abuse. (*People v. Brown* (2012) 54 Cal.4th 314, 330 ["cases are not authority for propositions not considered"].)[18]

Finally, despite the language relied on by defendant, *Doe v. Los Angeles*, *supra*, 37 Cal.App.5th 675 actually uses a constructive knowledge conception of foreseeability in distinguishing *Youth Soccer*, *supra*, 8 Cal.App.5th 1118. *Youth Soccer* concluded that allegations that soccer association defendants failed to conduct a criminal background check on a coach and discover a domestic violence conviction were sufficient to support liability. (*Id.* at pp. 1122, 1136.) Instead of declining to follow *Youth Soccer* on the ground that the actual knowledge standard meant that it was irrelevant what information should have been discovered, the *Doe v. Los Angeles* court distinguished *Youth Soccer* because the defendant FFA's "failure to conduct a home study, enforce capacity limits, follow up on the removal of a bed, or provide adequate training would not have led to information about the [perpetrators'] criminal propensities." (*Doe v. Los Angeles*, at pp. 684–685.) Thus, in the main case on which defendant relies, it appears the court would *not* have affirmed nonsuit if there had been evidence the defendant FFA should have discovered a risk of harm.[19]

---

[18] The same is true of other cases defendant and its supporting amici curiae rely upon. (See *Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889; *J.L. v. Children's Institute, Inc.* (2009) 177 Cal.App.4th 388; *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152, 157.)

[19] Indeed, three of the four amici curiae supporting defendant appear to employ a constructive knowledge formulation of foreseeability. The American Property Casualty Insurance Association refers to conduct an FFA "could not foresee and could not prevent." David and Margaret Home, Inc. refers to "vicarious liability for acts beyond an agency's control" and argues FFAs should only be liable for "acts they can influence." And California Alliance of

Although *Doe v. Los Angeles*, *supra*, 37 Cal.App.5th 675 does not support defendant's position on appeal, the actual knowledge standard is a limit that *may* be adopted pursuant to the *Rowland* analysis in appropriate circumstances.  The decision in *A.L.*, *supra*, 102 Cal.App.5th 477 is instructive.  The defendant in that case was a regional center, which is a nonprofit that connects developmentally disabled persons with support services.  (*Id.* at p. 481.)  The regional center was sued after a disabled person was sexually assaulted by an employee of the center's transportation vendor.  (*Ibid.*)  *A.L.* first concluded that "regional centers have a special relationship with their consumers that gives rise to a duty to protect consumers from sexual abuse." (*A.L.*, at p. 488.)  The court then turned to the *Rowland* factors to determine " 'whether considerations of public policy warrant limiting that duty' " (*ibid.*), ultimately concluding that regional centers only owe a duty to protect from sexual assault by vendors' employees "when a regional center fails to act despite its actual knowledge of a particular vendor employee's propensity for sexual assault" (*id.* at p. 494).  Although the court "assume[d] that all developmentally disabled persons are vulnerable and it is therefore more likely that they may be sexually assaulted" (*id.* at p. 490), the court repeatedly emphasized the lack of a direct relationship between the defendant regional center and the perpetrator in rejecting liability absent actual knowledge (*id.* at pp. 481–482, 486–487, 490–491).  The court stated, "Regional centers do *not* employ the vendors' employees; the *vendors* do" and "[r]egional centers do *not* own or control the vendors' premises; the *vendors*

Child and Family Services refers to "unforeseeable acts of third parties" and argues "[w]here there is no evidence that any failure in vetting or monitoring contributed to the harm, liability should not attach."  Where a defendant should have known of a risk of harm, that harm is not unforeseeable or unpreventable and the liability is not vicarious.

30

do." (*Id.* at p. 490.) The court characterized regional centers as " 'once removed,' " and observed, "The limited access and control regional centers have over the vendors with whom they contract . . . make it unlikely that additional vetting and monitoring would uncover the predilections of a vendor's employee to engage in sexual assault." (*Id.* at p. 491.)

Courts have also imposed an actual knowledge limit on liability where it was inappropriate to impose a duty to investigate. For example, courts have been loath to obligate parents to investigate and supervise their children's invitees. (See *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 156, 162 (*Margaret W.*) [parent had no "duty to investigate" on evening that plaintiff invited to sleepover was sexually assaulted after leaving parent's home because of "the consequences to the community of imposing" duty to protect "anyone invited into one's home"]; *Romero, supra*, 89 Cal.App.4th at p. 1083 [investigations "would impose unwarranted burdens and an unjustifiable risk of tort liability on families with teenage children"].) Privacy interests may also counsel against imposition of a duty to investigate. (*Al Shikha v. Lyft, Inc.* (2024) 102 Cal.App.5th 14, 28 [duty to screen passengers "would conflict with the strong public policy of maintaining consumer privacy"]; *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1567 ["there was no compelling state interest to require the employer to investigate the sexual practices of its employee"].)

c.      *Plaintiffs' Argument for the General Foreseeability Standard*

Plaintiffs, on the other hand, argue that sexual abuse of a foster child by a foster parent is always generally foreseeable, even absent evidence the defendant knew or should have known of the risk presented by a specific foster parent. They emphasize that foster children are an acutely vulnerable

population and sexual abuse by foster parents is a known risk that screening seeks to prevent. Indeed, the expert testimony below showed that some sex abusers seek to become foster parents to gain access to children. (See also *Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1135; *Juarez*, *supra*, 81 Cal.App.4th at p. 403.) One expert testified that risk was why "there [are] so many precautions in the approval process."

Prior Court of Appeal decisions have, in analogous circumstances, rejected the actual knowledge standard, finding that sexual abuse in certain categories of cases is a generally foreseeable harm.[20] (See *Lawndale*, *supra*, 72 Cal.App.5th at p. 132 ["sexual abuse by members 'of an organization that provide[s] activities exclusively for children'—like an elementary school district—is reasonably foreseeable, even where the organization 'had no knowledge that [the employee] had previously sexually or physically abused anyone or had a propensity to do so' "]; *Archbishop*, *supra*, 70 Cal.App.5th at p. 676 [due to widespread reports of clergy sexual abuse, "it was reasonably foreseeable that minors attending catechism classes . . . might be sexually molested by a priest, even though the Archdiocese did not have knowledge of prior sexual misconduct by [the perpetrator] specifically"]; *Juarez*, *supra*, 81 Cal.App.4th at pp. 395, 397–410 [sexual abuse by scoutmaster was generally foreseeable, such that Boy Scouts of America (Scouts) had duty to take protective measures, even though "there was no information accessible to the Scouts that would cause them to suspect that [the scoutmaster] had a

---

[20] Although the court in *A.L.*, *supra*, 102 Cal.App.5th at page 490 ultimately adopted the actual knowledge standard as a limit on liability, the court stated that the harm was generally foreseeable on the assumption "that all developmentally disabled persons are vulnerable and it is therefore more likely that they may be sexually assaulted."

32

propensity to molest children"];[21] see also *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1097–1098; *Youth Soccer, supra,* 8 Cal.App.5th at pp. 1132, 1135.)

Additionally, the existence of detailed regulations ensuring that FFAs screen prospective foster parents to, among other things, prevent the sexual abuse of foster children, suggests that such abuse is generally foreseeable. (See *Kesner, supra,* 1 Cal.5th at p. 1148; *Cabral, supra,* 51 Cal.4th at p. 776; *Youth Soccer, supra,* 8 Cal.App.5th at pp. 1132–1133; *Murrieta, supra,* 102 Cal.App.4th at pp. 914–915.)

It is also instructive to contrast the present category of cases with defendant's cases adopting the actual knowledge standard under the *Rowland* analysis. In defendant's cases, the defendants were " 'once removed' " from the perpetrators (*A.L., supra,* 102 Cal.App.5th at p. 491) or the defendants did not have an obligation to investigate the perpetrators (*Margaret W., supra,* 139 Cal.App.4th at p. 156; *Romero, supra,* 89 Cal.App.4th at p. 1083). But FFAs undertake to screen and supervise specific foster parents who will have unlimited access to vulnerable foster children; the possibility of sexual abuse by foster parents is known and an important focus of screening and supervision; and, in every instance, an FFA's recommendation will have been *necessary* for the placement of a child with the child's abuser. Due to all of those circumstances, FFAs have a responsibility and opportunity to mitigate the harm from a foster parent unlike that present in cases relied on by defendant. (See *Hesperia, supra,* 85 Cal.App.5th at p. 28 [declining to follow *Romero* because the " 'public policy

---

[21] As noted previously (fn. 17, *ante*), the *Juarez* court employed a constructive knowledge formulation of foreseeability as to the plaintiff's separate negligent "selection, supervision and retention" claim. (*Juarez, supra,* 81 Cal.App.4th at p. 395.)

reasons' " differ given " 'a school district's supervisory responsibilities' "].)
Given the unfortunate prevalence of sexual abuse, and the circumstance that
some sexual abusers seek to become foster parents to gain access to
vulnerable children, the risk posed by negligent screening and supervision is
not insubstantial.[22]

### d. *Conclusion on Foreseeability*

As explained above, the category of cases under consideration—
negligence claims against FFAs based on sexual abuse of foster children—is
distinguishable from the categories of cases in which courts have defined
foreseeability as requiring actual knowledge. More analogous are the
categories of cases addressed in *Regents*, *supra*, 4 Cal.5th 607 and *William S.
Hart*, *supra*, 53 Cal.4th 861, in which the defendants *do* have direct
relationships with the perpetrators of abuse, providing a greater opportunity
to prevent harm. The Supreme Court concluded foreseeability in those cases
required a showing of actual *or* constructive knowledge of a risk of harm, but
the foreseeability of harm is even greater here. Universities have less
opportunity to mitigate risk, given the number of students on a university's
campus, the minimal supervision of students, and the lack of a duty to
investigate. (See *Regents*, at p. 633 ["[U]niversities are not charged with a
broad duty to prevent violence against their students"].) And foster children

---

[22] Amicus curiae American Property Casualty Insurance Association
argues that the actual knowledge formulation of foreseeability is more
appropriate because, unlike many of the cases adopting the general
foreseeability standard, FFAs "do *not* have physical custody and/or control of
the minors they serve." But, amicus curiae fails to explain how that makes
sexual abuse by a negligently screened and supervised foster parent
unforeseeable. To the extent amicus curiae's argument is that the lack of
physical custody counsels against liability absent actual knowledge as a
matter of policy, we disagree for the reasons discussed regarding the other
*Rowland* factors.

are even more at risk than the students involved in *William S. Hart*, *supra*, 53 Cal.4th 861: foster children are placed in the home, hidden from easy supervision and under the near-total control of the foster parent.

Given the vulnerability of foster children to sexual abuse and the direct relationship between FFAs and the foster parents they screen, recommend, and supervise, the sexual abuse of foster children is a *generally foreseeable harm* of the category of negligence involved in the present case. Thus, the foreseeability of sexual abuse from an inadequately screened and supervised foster parent weighs *against* limiting an FFA's duty to protect. That does not, however, end the analysis, because we must consider the remainder of the *Rowland* factors. (*Juarez*, *supra*, 81 Cal.App.4th at pp. 404–405 ["[F]oreseeability is not coterminous with duty. [Citations.] 'A court may find that no duty exists, despite foreseeability of harm, because of other factors and considerations of public policy' "].) As explained below (part IV.C, *post*), this consideration leads us to conclude that the constructive knowledge standard is an appropriate limit on liability, despite the foreseeability of sexual abuse.

### 2. *Degree of Certainty of Injury*

"The second factor, 'the degree of *certainty* that the plaintiff suffered injury' [citation], may come into play when the plaintiff's claim involves intangible harm, such as emotional distress." (*Regents*, *supra*, 4 Cal.5th at p. 630.) Defendant does not dispute that the category of cases at issue here, involving sexual abuse of children, involves certain injury. " 'The significant emotional trauma caused by childhood sexual abuse, with its related societal costs, is well documented . . . .' " (*Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1098; accord, *D.G.*, *supra*, 108 Cal.App.5th at p. 472; *Archbishop*, *supra*, 70 Cal.App.5th at p. 678; see also *A.L.*, *supra*, 102

35

Cal.App.5th at p. 490 [referencing "absolute certainty that developmentally disabled persons are injured if they are sexually assaulted"].)

Accordingly, the certainty of injury factor provides no reason to limit the duty to protect in the category of cases under consideration.

### 3. *Closeness of Connection Between Conduct and Injury*

"The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.' [Citation.] 'Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable. Conversely, a closely connected type of injury is likely to be deemed foreseeable.' " (*Regents*, *supra*, 4 Cal.5th at pp. 630–631.) This prong is " 'strongly related to the question of foreseeability itself,' " but it " 'accounts for [the] third party' " conduct. (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1023 (*Kuciemba*).) If " 'the third party's intervening conduct is foreseeable or derivative of the defendant's, then that conduct does not " 'diminish the closeness of the connection between defendant['s] conduct and plaintiff's injury.' " ' " (*Id.* at pp. 1023–1024; see also *Kesner*, *supra*, 1 Cal.5th at p. 1148 ["the touchstone of the analysis is the foreseeability of that intervening conduct"].)

Defendant again incorrectly analyzes this factor in light of the specific evidence in this case, arguing there is no close connection because "there is no evidence Martinez had either a criminal record or a record of propensities to molest children." The proper question is whether, *categorically*, sexual abuse may be considered closely connected to an FFA's negligence in screening and supervising a foster parent. On *that* question, we conclude an FFA's negligence is *most* closely connected with subsequent sexual abuse where an

36

FFA knew or should have known of a risk of sexual abuse by a particular foster parent. (*Regents*, *supra*, 4 Cal.5th at p. 631 ["When circumstances put a school on notice that a student is at risk to commit violence against other students, the school's failure to take appropriate steps to warn or protect foreseeable victims can be causally connected to injuries the victims suffer as a result of that violence"].)

A comparison to the circumstances and analysis in *A.L.*, *supra*, 102 Cal.App.5th 477 is instructive. In limiting the duty of regional centers to protect disabled persons from sexual assault by vendor employees, the court reasoned that "the connection between shortcomings in vetting and monitoring of a vendor and a subsequent sexual assault by one of the vendor's employees is weak" because the regional centers were " 'once removed' " from the perpetrator and it was unlikely that additional measures would be effective at preventing harm. (*Id.* at p. 491.) In contrast, FFAs have direct responsibility to screen and monitor particular foster parents; they have extensive access to those parents before and during placements, and diligent screening and supervision is the best way to uncover foster parents who present a risk of abuse.

If a foster parent who an FFA should have known posed a risk of sexual abuse goes on to commit abuse, that intervening conduct is not unforeseeable. On the other hand, if an FFA could not have discovered the risk of harm with a reasonable investigation—that is, had no constructive knowledge of a risk— then the intervening abuse was not foreseeable. Accordingly, the close connection factor supports limiting the duty to protect to cases where an FFA has actual or constructive knowledge of a risk of abuse.

B.    *Policy Factors*

As the Supreme Court explained in *Regents*, " ' [a] duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.' " (*Regents*, *supra*, 4 Cal.5th at p. 631.)  Contrary to defendant's case-specific approach, which focuses on the absence of evidence Mr. Martinez previously molested a child, the *Rowland* policy issue is whether, *assuming negligence and causation*, the defendant's liability should nevertheless be limited due to other policy considerations. (See *Cabral*, *supra*, 51 Cal.4th at p. 772 [in applying the *Rowland* policy factors "we have asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy"]; see also *id.* at p. 768 [observing that, if the court recognized a "categorical exemption from the duty of ordinary care," "no liability could be imposed even when" a person acts "unjustifiably" and in a "particularly dangerous" way].)

1.    *Moral Blame*

"The first policy factor concerns 'the moral blame attached to the defendant's conduct.' " (*Kuciemba*, *supra*, 14 Cal.5th at p. 1025.)  As relevant here, " '[the Supreme Court has] previously assigned moral blame, and [has] relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.' " (*Id.* at p. 1026.)

38

Approaching the issue categorically,[23] it is clear that moral blame may be attributed to an FFA that knew or should have known of a risk of abuse by a foster parent but nevertheless placed a child with that foster parent. (*Novartis, supra,* 4 Cal.5th at p. 174 ["Significant moral blame attaches where a brand-name drug manufacturer fails to warn about the unsafe effects of its drug, when those effects are known or reasonably should have been known to the manufacturer"]; *Lawndale, supra,* 72 Cal.App.5th at p. 135 ["Administrators who fail to notice, identify, and respond to warning signs that suggest an employee is sexually abusing or will sexually abuse a student bear some moral responsibility for the abuse"]; *D.G., supra,* 108 Cal.App.5th at p. 473 ["some degree of moral blame must be attributed to the County for failing to act once it had indicators of sexual abuse"].) Although *some* blame may be attributed to any FFA that acts negligently in conducting screening and supervision, moral blame for purposes of the *Rowland* analysis attaches only where an FFA should have discovered a risk of harm. (*William S. Hart, supra,* 53 Cal.4th at p. 878 ["Unless the individual alleged to be negligent in a hiring or retention decision knew or should have known of the dangerous propensities of the employee who injured the plaintiff, there is little or no moral blame attached to the person's action or inaction"]; *Archbishop, supra,* 70 Cal.App.5th at p. 680 ["courts have hesitated to assign moral blame in cases where the defendant did not know or have reason to

---

[23] Defendant again errs in focusing on its preferred specific facts in the underlying case, arguing that it "allowed a foster parent who had successfully served as both a biological and foster parent, who had no criminal record, and who apparently committed an unprecedented molestation to serve as a foster parent." That argument was relevant to the jury's determination of whether defendant breached its duty of care, not to whether moral blame attaches to the category of alleged negligent conduct under consideration.

39

know that a particular teacher or coach would sexually abuse the plaintiff"].)[24]

On the other hand, we reject defendant's apparent suggestion that moral blame is only attributable to an FFA that approves a foster parent despite *actual* knowledge of a risk of abuse. The special relationship between an FFA and a foster child involves a duty of protection and an opportunity for mitigation of harm, and it is appropriate to assign moral blame to an FFA that fails to act reasonably in discovering a risk of harm. In *Regents*, in discussing the moral blame factor, the court emphasized that "compared to students, colleges will typically have access to more information about potential threats and a superior ability to control the environment and prevent harm. This disparity in knowledge and control tips the balance slightly in favor of duty." (*Regents*, *supra*, 4 Cal.5th at pp. 631–632.) The same is even more true here; foster children have no realistic ability to prevent harm in their placements, and sexual abuse is a generally known risk in foster care. (See *Lawndale*, *supra*, 72 Cal.App.5th at p. 134 ["Secondary school students, even more than college students, are considerably more vulnerable and unsophisticated than school administrators"].)

Accordingly, the moral blame factor supports recognizing an FFA's duty to protect where it has actual or constructive knowledge of a particular risk of

---

[24] The court in *Archbishop*, *supra*, 70 Cal.App.5th at page 680 did "attribute some moral blame to the Archdiocese because it took only minimal action to prevent sexual abuse by priests, even after receiving dozens of reports of abuse . . . ." That situation, where a defendant has notice of a general risk of a type of harm but essentially fails to take any steps to prevent it, is not at issue here, because FFAs are obligated by statute to prevent sexual abuse. The moral blame issue in the present case is more similar to that involved in *Novartis*, *William S. Hart*, *Lawndale,* and *D.G.*

harm. "[C]onsidering [an FFA's] greater access to knowledge and control" (*Kuciemba, supra*, 14 Cal.5th at p. 1026), the factor does *not* support limiting liability to situations involving actual knowledge.

2. *The Policy of Preventing Future Harm*

"The next *Rowland* factor, the 'policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible.' [Citation.] Placing the cost of negligence on responsible parties is generally thought to induce behavioral changes that will make the activity in question safer. [Citation.] However, '[t]he policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.' [Citation.] This factor thus examines both the positive and the negative societal consequences of recognizing a tort duty." (*Kuciemba, supra*, 14 Cal.5th at p. 1026.)

Given that liability would only attach upon a finding that an FFA's negligence was a substantial factor in a foster child's harm (see *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1313–1314), liability in the present category of cases would impose the costs of negligent conduct on one of the parties responsible. That would further incentivize FFAs to ensure they screen foster parents as diligently as possible, and defendant does not dispute that diligent screening and supervision by FFAs is the most effective method available to prevent sexual abuse by foster parents. (See *Archbishop, supra*, 70 Cal.App.5th at pp. 680–681 ["the societal goal of safeguarding youth from sexual abuse weighs strongly in favor of imposing a duty to implement policies and procedures to protect minors" from abuse]; *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1100 [observing that the defendant association was "in the best position to take steps to protect

41

youth athletes who attend Olympic taekwondo competitions alone with their coaches"]; see also *Regents*, *supra*, 4 Cal.5th at p. 632 ["recognizing a duty serves the policy of preventing future harm"].) Defendant argues that FFAs are already incentivized to comply with screening obligations and that the statutory scheme provides for consequences for violations, including loss of licensure. However, that a defendant may have other incentives to exercise due care does not negate that the imposition of liability is an effective incentive, particularly where the effectiveness of other incentives is unknown.

This is not a situation like that in *A.L.*, *supra*, 102 Cal.App.5th at page 491, where, as discussed above, the court concluded liability would be ineffective in preventing the harm. Unlike the defendant in *A.L.*, FFAs are directly responsible for screening, recommending, and supervising specific foster parents, and the screening process is the primary way that unsuitable foster parents can be identified. Defendant argues, "absolutely perfect checks may fail to disclose a molester who has never committed such a crime before." That, unfortunately, is quite true. But that does not mean liability will, categorically, be ineffective in preventing future harm.[25]

Defendant's sole argument that there are " 'undesirable consequences of allowing potential liability' " (*Kuciemba*, *supra*, 14 Cal.5th at p. 1026) absent actual knowledge of a risk of harm is based on the limited availability of insurance. We address that argument below. Otherwise, the policy of preventing future harm strongly weighs against limiting an FFA's duty to

---

[25] As amicus curiae Children's Advocacy Institute suggests, defendant's standard of foreseeability might actually increase the risk of sexual abuse, "as an FFA cannot 'actually know' what it does not search for," creating an incentive for "indolence in scrutinizing foster parents for their likelihood of sexually abusing children."

42

protect to circumstances where the FFA has actual knowledge of a risk of harm. Both the constructive knowledge and general foreseeability standards would strongly incentivize compliance with screening and supervision obligations, so the factor supports either not limiting the duty to protect at all (as plaintiffs argue) or adoption of the constructive knowledge limit.

### 3. *The Burden of Imposing a Duty*

The next factor considers "the *burden* that recognizing a tort duty would impose on the defendant and the community." (*Regents*, *supra*, 4 Cal.5th at p. 633.) " '[T]he most relevant burden is the cost to the defendants of upholding, not violating, the duty of ordinary care.' " (*Kuciemba*, *supra*, 14 Cal.5th at p. 1028.)

In *Regents*, the court found the factor did *not* weigh against liability: "Because the record reflects that colleges have already focused considerable attention on identifying and responding to potential threats, and have funding sources available for these efforts, it does not appear that recognizing a legal duty to protect students from foreseeable threats would pose an unmanageable burden." (*Regents*, *supra*, 4 Cal.5th at p. 633.) The same reasoning applies in the present case: because FFAs are statutorily obligated to screen foster parents and because screening and supervision are the primary functions FFAs perform, liability would not significantly increase the burdens on FFAs.

Plaintiffs do not argue defendant was obligated to perform screening or supervision tasks outside those already provided for by statute or defendant's policies. Instead, the alleged negligence was defendant's "failure to effectively . . . implement existing policies" (*Archbishop*, *supra*, 70 Cal.App.5th at p. 681) and comply with existing statutory obligations. (See *Lawndale*, *supra*, 72 Cal.App.5th at p. 137 ["Imposing a duty to prevent

43

sexual abuse of minors is less burdensome where an organization has already implemented policies to prevent such abuse"].) And this is not a situation where failing to restrict the duty of care would require the screening and monitoring of an unreasonable number of persons. (Cf. *A.L.*, *supra*, 102 Cal.App.5th at p. 492.)

Accordingly, the burden factor does not provide a reason to limit the duty to protect in the category of cases under consideration.

### 4. *Availability of Insurance*

"The final policy factor in a duty analysis is the *availability of insurance* for the risk involved." (*Regents*, *supra*, 4 Cal.5th at p. 633.) The reason to include that as a factor is because "the tort system contemplates that the cost of an injury, instead of amounting to a 'needless' and 'overwhelming misfortune to the person injured,' will instead 'be insured by the [defendant] and distributed among the public as a cost of doing business.' [Citation.] Such allocation of costs serves to ensure that those 'best situated' to prevent such injuries are incentivized to do so." (*Kesner*, *supra*, 1 Cal.5th at p. 1153.) But the cost distribution mechanism operates less effectively or not at all where insurance is unavailable.[26]

---

[26] The caselaw provides little guidance on how to apply this factor. (See, e.g., *Kuciemba*, *supra*, 14 Cal.5th at p. 1031 ["Given the dearth of information available at this time, we are unable to draw any firm conclusions as to whether this factor supports imposing a duty"]; *Regents*, *supra*, 4 Cal.5th at p. 633 [the defendant "offered no reason to doubt colleges' ability to obtain coverage for the negligence liability under consideration"]; *Novartis*, *supra*, 4 Cal.5th at p. 174 ["[the defendant] offers no reason why a brand-name drug manufacturer would be unable to insure against the risk of warning label liability"]; *D.G.*, *supra*, 108 Cal.App.5th at p. 472 ["the record includes no information" about "the availability of insurance"].) Indeed, neither party has cited any case in which there was a showing of limited insurance availability, and we are aware of none.

Here, defendant has made a strong showing of limited liability coverage availability for FFAs. (See part II, *ante*.) Plaintiffs do not seriously dispute that there is limited availability or that FFAs must have liability coverage to operate. However, although defendant has demonstrated the dwindling availability of liability insurance for FFAs, defendant has *not* shown that adoption of its proposed limit on liability would have an appreciable effect on insurance company coverage decisions or prevent FFA closures. In its amicus curiae brief, NIAC explains that various factors have increased the potential liability faced by FFAs and suggests that the actual knowledge standard of foreseeability would be "a strong step in addressing the underlying causes of the insurability crisis." NIAC also states that its "reinsurance broker indicated the extreme risk presented by foster family agencies and their being held to account for the wrongful acts of counties and the unforeseeable acts of third parties presents a risk that reinsurers see as largely uninsurable/unable to underwrite and price." On the other hand, amicus curiae Children's Advocacy Institute suggests there are various causes of the limited availability of insurance and points out, "[i]t is not at all clear that" adopting defendant's position "will predictably lead to insurers re-entering the FFA market at affordable rates at a fast timetable . . . because it [is not] settled that limiting liability always or predictably leads to more, and more affordable, insurance."

Based on the current record, this court cannot determine precisely why insurance is becoming unavailable, nor can we conclude that adoption of defendant's position would materially relieve the insurance availability problem described by Commissioner Lara. Additionally, this court can only speculate whether adoption of a constructive knowledge standard would be

45

substantially less helpful in addressing the problem than the actual knowledge standard defendant proposes.

Where insurance is broadly and affordably available for a category of harm, the insurance factor weighs against limiting the duty to protect, because courts have assurance that the costs of the harm will " 'be insured by the [defendant] and distributed among the public as a cost of doing business.' " (*Kesner, supra*, 1 Cal.5th at p. 1153; see also *Cabral, supra*, 51 Cal.4th at p. 784, fn. 12 ["Insurance for operation of motor vehicles is generally available and, indeed, required, and there is no reason to believe its cost or prevalence will be significantly affected by declining to create the duty exception [defendant] seeks"].) But where, as here, the information before the court shows insurance is *not* broadly available, the factor weighs in favor of limiting the duty to protect. Although defendant has *not* shown limiting liability will make liability coverage broadly available again, for purposes of the *Rowland* analysis it is sufficient that defendant has shown that insurance is *not* broadly available to FFAs and that limiting its duty to protect will be a step in the right direction. Indeed, the *absence* of the type of cost distribution insurance scheme described in *Kesner* alone weighs in favor of limiting liability.[27] (*Kesner*, at p. 1153.)

In sum, the limited availability of insurance weighs in favor of limiting the scope of the duty to protect, especially because state policy favors the continued viability of FFAs (see part II, *ante*). (See *Cabral, supra*, 51 Cal.4th

---

[27] Amicus curiae Children's Advocacy Institute suggests that "other policy options exist that offer more predictable and compassionate ways to address FFA insurance unaffordability and unavailability than what is proposed by" defendant. We urge the executive and legislative branches to explore all such alternatives, but the existence of hypothetical alternatives does not defeat defendant's showing of limited insurance availability for the purposes of the *Rowland* analysis.

at p. 782 ["the question before us is only whether there is any state policy, such as would clearly justify an exception to the general duty of ordinary care, *promoting or protecting* the activity"]; cf. *Kesner*, *supra*, 1 Cal.5th at p. 1156 ["Although the lawful use of asbestos is not inherently reprehensible, no state policy promotes or specially protects it"].) The *weight* we accord to the factor is a separate issue addressed below.

      C.    *Balancing of* Rowland *Factors*

" 'In assessing duty, . . . we do not merely count up the factors on either side.' [Citation.] Some factors may be so weighty as to tip the balance one way or the other." (*Kuciemba*, *supra*, 14 Cal.5th at p. 1031.) For example, in *Kuciemba*, the court declined to recognize a duty of care of employers to "prevent the spread of COVID-19 to employees' household members" because of "the significant and unpredictable burden that recognizing a duty of care would impose on California businesses, the court system, and the community." (*Id.* at pp. 1033, 1031.) Here, the *Rowland* factors clearly support limiting an FFA's liability for the sexual abuse of minors placed in foster care only where the FFA lacked actual *or* constructive knowledge that a foster parent presented a risk of sexual abuse.

As explained above, the considerations that have led courts to limit liability to actual knowledge include the lack of a direct relationship between the defendant and the perpetrator, the burdens of protective measures, the lack of a duty to investigate, and privacy concerns. None of those considerations are present here. Furthermore, relieving FFAs from liability for sexual abuse resulting from risks they should have been aware of would relieve them from liability for harms closely connected to their negligence and

47

for which they bear substantial moral blame, and would undermine the critical goal of protecting foster children from sexual abuse.[28]

On the other hand, although FFAs play a critical role in protecting foster children and sexual abuse is a generally foreseeable harm of negligent screening and supervision of a foster parent, other *Rowland* factors favor liability only where an FFA knew or should have known of the risk posed by a foster parent. Harms in such circumstances are closely connected to an FFA's negligence and are harms for which the FFA bears substantial moral blame. And there is no basis to conclude that imposing liability in the absence of actual or constructive knowledge would better motivate FFAs to

---

[28] In a supplemental brief, plaintiffs erroneously assert that "the jury's negligence verdict necessarily encompasses the constructive-knowledge determination" (see part V, *post*), but they do not object to adoption of that limit on duty pursuant to the *Rowland* analysis. In its supplemental brief, defendant suggests the meaning of "constructive knowledge" is unclear because the standard can encompass a narrower "reason to know" standard that does not impose a duty of inquiry. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 546–547.) We refer herein to the "knew or should have known" definition of constructive knowledge employed by the Supreme Court in *Regents*, *supra*, 4 Cal.5th at page 630; *William S. Hart, supra*, 53 Cal.4th at page 865; and *Novartis*, *supra*, 4 Cal.5th at page 165. Application of the standard is "a case-specific question" for the factfinder "to be examined in light of all the surrounding circumstances." (*Regents*, at p. 630; see also *Regents of University of California v. Superior Court* (2018) 29 Cal.App.5th 890, 901–902 [applying constructive knowledge standard on remand].)

Defendant also suggests that the constructive knowledge standard is "disfavor[ed]," but the cases it cites arise in very different contexts than our own. (See *Weeks v. Interactive Life Forms, LLC* (2024) 100 Cal.App.5th 1077 [notice of agreement to arbitrate in e-commerce website terms of use]; *MacGowan v. Jones* (1904) 142 Cal. 593, 595 [statutory notice by publication]; *Call v. Hastings* (1853) 3 Cal.179 [statutory notice of property records].) There is no indication the standard is disfavored in negligence cases involving harm by third parties, in which juries are regularly called upon to apply the standard. (See fn. 17, *ante*.)

diligently comply with their screening and supervision obligations—imputing FFAs with knowledge of the information they should have discovered provides such motivation.

The two different formulations of foreseeability employed in *Juarez*, *supra*, 81 Cal.App.4th 377 are instructive. The court employed a constructive knowledge formulation of foreseeability as to the plaintiff's negligent selection, retention, and supervision claim, based on caselaw limits to the negligent hiring cause of action; and the court employed a general foreseeability formulation as to the plaintiff's claim that the Scouts negligently failed to adopt protective measures, after discussion of the *Rowland* factors. (*Id.* at pp. 393, 395, 397–410.) Although *Juarez* did not discuss the *Rowland* factors as to the first claim, the foreseeability limit in the negligent hiring context reflects a policy judgment that constructive knowledge is an appropriate limit on the duty to protect in that category of cases. (See *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 842–843; *Underwriters Ins. Co. v. Purdie* (1983) 145 Cal.App.3d 57, 69; Rest.2nd Agency, § 213.)[29] In the present case, the alleged negligence is more like that involved in a negligent hiring claim, because plaintiffs allege defendant was negligent in approving and supervising Mr. Martinez. Plaintiffs do *not* allege defendant was negligent in failing to adopt protective measures, which is the type of claim to which *Juarez* applied the general foreseeability standard. Thus, comparing the present category of

---

[29] For a negligent hiring, supervision, or retention of employee claim, CACI No. 426 instructs that the plaintiff must prove that "[*name of employer defendant*] knew or should have known that [*name of employee*] [[was/became] [unfit/ [or] incompetent]/[*other particular risk*]] and that this [unfitness [or] incompetence/[*other particular risk*]] created a particular risk to others."

cases to the two types of negligence considered in *Juarez* also supports adoption of the constructive knowledge formulation of foreseeability.

Finally, the lack of liability insurance for FFAs weighs in favor of limiting liability under the *Rowland* analysis. But we do not believe it *strongly* weighs in favor of limiting liability, given the uncertainty that such a step will result in the broad availability of coverage. As noted previously (fn. 27, *ante*), this is an appropriate area for intervention by the legislative and executive branches. Denying liability to foster children wronged by negligent FFAs would be a blunt and morally fraught approach to addressing the lack of liability coverage; the other branches of government are better suited to craft creative solutions that broadly distribute the costs associated with supporting a sustainable insurance landscape for FFAs.[30] Thus, although the insurance factor weighs in favor of limiting liability, our holding would be the same without consideration of that factor.

In conclusion, after balancing the *Rowland* factors, we adopt the constructive knowledge formulation of foreseeability as a limit on an FFA's duty to protect the foster children it serves. Accordingly, in order to hold an FFA liable under negligence for sexual abuse of a foster child by a foster parent, a plaintiff must show that the defendant FFA knew or should have known that the parent presented a risk of committing sexual abuse.[31]

---

[30] Given that part of the justification for the insurance factor appears to be a sense that it is unfair to impose liability on a defendant who is unable to distribute the cost of liability through insurance coverage (see *Kesner, supra,* 1 Cal.5th at p. 1153), it would be ironic to solve that problem by effectively imposing *all* of the cost on a plaintiff by denying liability.

[31] Defendant also requests that this court limit the liability of FFAs that have substantially complied with the requirements for screening foster parents. But defendant cites no authority that such a rule may be adopted as a categorical limit on liability pursuant to the *Rowland* analysis. Instead,

V. *Defendant Has Not Shown a Miscarriage of Justice Requiring Reversal*

In the present case, the jury instructions permitted the jury to find defendant liable for negligence absent a finding that it knew or should have known of the risk of abuse.[32]  In particular, the jury was instructed that "[n]egligence is the failure to use reasonable care to prevent harm to oneself or to others. . . .  A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.  You must decide how a reasonably careful person would have acted in defendant's situation."  The jury was also instructed on the theory of negligence per se that if plaintiffs proved that defendant violated any of four Licensing Standards, the jury "must find that [defendant] was negligent."  The jury was also instructed to find whether defendant's negligence was a "substantial factor in causing plaintiffs' harm," which the court defined as "a

---

the degree of an FFA's compliance with its screening obligations is a matter for the jury to consider in its assessment of breach and causation.  (See *Regents*, *supra*, 4 Cal.5th at p. 630; *Cabral*, *supra*, 51 Cal.4th at p. 772; see also *Doe v. Los Angeles*, *supra*, 37 Cal.App.5th at p. 685.)

[32] Plaintiffs contend defendant forfeited any claim the jury should have been directed to determine whether defendant had constructive knowledge of the risk of harm.  However, an objection is not required to preserve an objection to instructions that are " ' "an incorrect statement of law." ' " (*Khoiny v. Dignity Health* (2022) 76 Cal.App.5th 390, 417.)  Here, the trial court's instruction on negligence was incorrect because it allowed the jury to find defendant liable without a finding of constructive knowledge.  In any event, defendant clearly preserved its claim the jury should have been required to find *actual* knowledge, and resolution of *that* claim required this court to determine the appropriate limits to liability under the *Rowland* analysis.  Plaintiffs cite no authority that, having resolved the issue presented and having concluded the jury was erroneously instructed, it would be improper for this court to reverse the judgment if the error were prejudicial.

51

factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

"A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580; accord, *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.) "[T]his test permits reversal ' "only when the [reviewing] court . . . is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Soule*, at p. 576.)

At the outset, we note that defendant does not explain why the instructional error requires reversal. (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 134 [" ' "[T]he appellant bears the duty of spelling out in his brief exactly how the error caused a 'miscarriage of justice' " ' "].) In our request for supplemental briefing, this court specifically asked the parties whether, if we were to conclude that constructive knowledge is the appropriate limit on the duty to protect, reversal would be required. Rather than describing evidence showing the error was prejudicial, defendant merely referenced the undisputed fact that "[t]he issue of constructive [knowledge] did not go to the jury." But that entirely failed to address the determinative question of whether it is reasonably probable the result would have been different had the jury been properly instructed.

It is not reasonably probable a properly instructed jury would have ruled in defendant's favor. We acknowledge defendant's evidence that nothing in Mr. Martinez's background checks, references, or history as a

parent and foster parent gave any indication of a risk of abuse. However, it is undisputed that Mr. Martinez indicated "sexual relations" were a "major area[] of conflict" with his wife and that he left numerous questions blank on his questionnaire, including questions about childhood sexual abuse, accusations of sexual abuse, and child pornography. Both parties' experts agreed that marital sexual conflict is a risk for possible sexual abuse, and plaintiffs' expert testified Mr. Martinez's failure to answer questions was another red flag. Furthermore, there was evidence that defendant should have discovered Mr. Martinez's mental illness; that alone was not evidence of a risk of sexual abuse, but the jury could infer it elevated the risk of abuse.

Although defendant did not take advantage of the opportunity to demonstrate prejudice in its supplemental brief, it elsewhere emphasized its home approver's testimony that she *did* investigate the gaps on Mr. Martinez's questionnaire and that she *did* ask about the martial sexual conflict, because it was her practice to do so. However, that testimony was directly contradicted by Ms. Martinez, who stated at her deposition that Ms. Van Zantwyk did *not* inquire into those matters or into Mr. Martinez's mental health. As the background summary demonstrates, defendant's defense largely depended on the jury believing Ms. Van Zantwyk's testimony regarding her practices in screening foster homes. Ms. Van Zantwyk essentially testified that she did *not* ignore the red flags on Mr. Martinez's application and that she thoroughly explored Mr. Martinez's mental health, even though at the time of trial she could not recall what that investigation uncovered. The jury's verdict demonstrates that it rejected that testimony because it was those precise failures that establish that the Martinezes

53

should not have been approved.[33] There is no evidence that any of the other failures identified by plaintiffs would have uncovered a basis to disapprove the Martinezes as foster parents.

At oral argument, defendant suggested that, under the negligence per se instruction, the jury could have found negligence based on a technical violation of a regulation unrelated to a risk of sexual abuse. For example, the jury was told that defendant was obligated to conduct the majority of its screening interviews at the Martinez home. However, there is no basis to conclude the jury relied on a violation of that regulation or any other regulation where compliance would not have uncovered a basis to deny approval of the Martinezes. Furthermore, the jury's allocation of 60 percent of the responsibility for plaintiffs' harm to defendant (see part VI, *post*) is a strong indication that the jury's liability finding was *not* based on a technical violation of a regulation unrelated to a risk of sexual abuse. If the jury had found that defendant had only violated a regulation or regulations that, if complied with, still would not have uncovered the risk of abuse from Mr. Martinez, it is highly unlikely the jury would have assigned most of the responsibility for the abuse to defendant. That is, the jury's apportionment of fault demonstrates that it believed there was a strong causal link between defendant's negligent conduct and the abuse of plaintiffs. Accordingly, defendant has not shown it is reasonably probable the jury would have failed to find that defendant knew or should have known of the risk of sexual abuse.

Defendant has not shown the verdict was a miscarriage of justice requiring reversal.

---

[33] Contrary to defendant's assertion at oral argument, we do not resolve the evidentiary conflict in plaintiffs' favor. Instead, we conclude that the verdict demonstrates that the jury necessarily rejected Ms. Van Zantwyk's testimony on these issues.

VI.     *We Decline to Reverse Due to the Jury's Apportionment of Fault*

Defendant contends that, even if this court rejects its argument based on the *Rowland* analysis, this court should reverse because the jury allocated more responsibility to defendant (60 percent) than it did to the actual perpetrator, Mr. Martinez (35 percent).  However, "the jury's power to apportion fault is as broad as its duty to resolve conflicts in the evidence and assess credibility . . . .  '[T]he appellate court may not substitute its judgment for that of the jury or set aside the jury's finding if there is any evidence which under any reasonable view supports the jury's apportionment.' " (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1234 (*Rosh*).)

*Rosh*, *supra*, 26 Cal.App.4th 1225 is directly on point.  There, the court affirmed a jury verdict for a shooting that apportioned only 25 percent fault to the shooter and 75 percent to a negligent security company.  (*Rosh*, at pp. 1232–1233.)  *Rosh* rejected the defendant's argument that "no reasonable person could conclude a negligent tortfeasor was more responsible for an injury than an intentional tortfeasor." (*Id.* at p. 1233; see also *Samantha B. v. Aurora Vista Del Mar, LLC* (2022) 77 Cal.App.5th 85, 91, 104–105 [affirming allocation of 65 percent fault to a psychiatric hospital and management company and 35 percent to an employee who sexually abused patients].)

Defendant "asks [this court] to *change* the law on fault apportionment in this situation, to avoid the unfair result of apportioning a party that failed to prevent a crime more fault than the person who perpetrated the crime." We decline to do so.[34]

_____

[34] Defendant relies on a statement in *William S. Hart*, *supra*, 53 Cal.4th at page 879 that "the greater share of fault will ordinarily lie with the individual who intentionally abused or harassed the student than with any other party, and that fact should be reflected in any allocation of comparative

## DISPOSITION

The trial court's judgment is affirmed.  The parties shall bear their own costs on appeal.

                                                          SIMONS, J.

We concur.

JACKSON, P. J.
BURNS, J.

(A170226, A171966)

---

fault."  We agree with *A.H. v. Tamalpais Union High School Dist.* (2024) 105 Cal.App.5th 340, 353–354, that the statement in *William S. Hart* is an "observation" and "not a rule of law."

## C.F., a Minor, etc., et al. v. Alternative Family Services, Inc. (A170226, A171966)

Trial Court:      Superior Court of California, County of Sonoma

Trial Judge:      Hon. Patrick M. Broderick

Counsel:      Pollak, Vida & Barer, Daniel P. Barer, Karen M. Stepanyan of Pollak; Friedenthal Heffernan & Brown and Daniel R. Friedenthal for Defendant and Appellant.

Beach Law Group, Molly M. Loy, Paul D. Singer and David W. Loy for American Property Casualty Insurance Association as Amicus Curiae on behalf of Defendant and Appellant.

Peter Weldy, in pro. per., for California Alliance of Child and Family Services as Amicus Curiae on behalf of Defendant and Appellant.

Daniel S. Maydeck, in pro. per., for David and Margaret Home, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Christopher A. Reed for Nonprofits Insurance Alliance of California as Amicus Curiae on behalf of Defendant and Appellant.

Esner, Chang, Boyer & Murphy, Andrew N. Chang, Stuart B. Esner, Kevin K. Nguyen; Abbey, Weitzenberg, Warren & Emery, Scott R. Montgomery, Kaitlyn D. Wright, Natasha E. Berg; The Law Office of Johann Hall and Johann A. Hall for Plaintiffs and Respondents.

Edward P. Howard for Children's Advocacy Institute as Amicus Curiae on behalf of Plaintiffs and Respondents.

Law Office of A. Charles Dell'Ario and Alan Charles Dell'Ario for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Wyatt A. Vespermann for Panish Shea Ravipudi LLP as Amicus Curiae on behalf of Plaintiffs and Respondents.